**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| HOWARD BOWEN HANKINS, Jr. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.   3:20cv300 |
| v. | ) | |
| | ) | |
| RALPH S. NORTHAM, | ) | |
| | ) | |
| BRIAN J. MORAN, | ) | |
| | ) | |
| HAROLD CLARKE, | ) | |
| | ) | |
| TIKKI HICKS, | ) | |
| | ) | |
| CLINT DAVIS, | ) | |
| | ) | |
| MARK AMONETTE, | | |
| | | |
| STEVE HERRICK. | | |
| | | |
| Defendants. | | |

**COMPLAINT**

1.     Plaintiff, Howard Bowen Hankins, Jr. (hereinafter "Bowen"), through undersigned counsel sues the Virginia Department of Corrections, Haynesville Correctional Center, and Keen Mountain Correctional Center pursuant 42 U.S.C. § 1983 alleging violations of the Eighth and Fourteenth Amendments through deliberate indifference to a serious medical condition. Specifically, Defendants have refused to treat Bowen for infection of the Hepatitis C virus and for potential cirrhosis of the liver, despite the availability of medications which can essentially cure or remedy

the symptoms of Hepatitis C in most cases. Defendants have denied Bowen medication because they claim that Bowen's Hepatitis C has not progressed far enough.

2.      Bowen through undersigned counsel sues the Virginia Department of Corrections and Haynesville Correctional Center pursuant 42 U.S.C. § 1983 alleging violations of the Eighth and Fourteenth Amendments through the Defendants' failure to adequately address the extreme health risk posed by COVID-19. Specifically, Defendant is aware of the population density and spatial limitations in the Haynesville Correctional Center, as well as, lack of basic supplies, equipment and sanitation policies for inmates and staff.

3.      Bowen brings this suit seeking preliminary and permanent injunctive relief and a declaratory judgment, compensatory, punitive, and special damages, as well as, all court cost and attorney fees from this honorable Court with the prayer that his Eighth and Fourteenth Amendment protections may intervene in his defense before it is too late.

## JURISDICTION AND VENUE

4.      This court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3) and (4).

5.      Venue is appropriate in this district pursuant to 28 U.S.C. §1391(b), as a substantial part of the events and omissions giving rise to Bowen's claims occurred in the Eastern District of Virginia.

## PRELIMINARY STATEMENT

6.      The Virginia Department of Corrections (hereinafter "VDOC") is responsible for the implementation and oversight of all policies governing Virginia's State Correctional facilities ("prisons" or "penitentiaries"), including all policies governing the specific facilities managed by the independently named wardens herein and prison facilities including Keen Mountain

Correctional Center (hereinafter "KMCC") and Haynesville Correctional Center (hereinafter "HCC") where Bowen is currently housed. Virginia's Governor Ralph Northam, Virginia's Secretary of Public Safety and Homeland Security Brian Moran, and the VDOC Director Harold Clarke are the official governing authorities for the VDOC and are responsible for implementing policies that govern prison staff, contractors, inmates, visitors, properties, and suppliers. Additionally, the wardens of each facility are responsible for implementing policies that also govern prison staff, contractors, inmates, visitors, properties and suppliers. The VDOC and its prisons are charged with providing humane conditions of confinement, medical care for inmates, nutrition, safety, and the protection of inmates' constitutional rights.

7.      The Eighth Amendment of the United States Constitution, as applied to the States via the Fourteenth Amendment, protects all Americans from cruel and unusual punishment at the hands of the State. Within that guarantee, the Supreme Court of the United States has recognized that this Eighth Amendment protection "does not mandate comfortable prisons," but neither does it permit inhumane ones, and it is now settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer* v. *Brennan*, 511 U.S. 825, 832 (1994). In its prohibition of "cruel and unusual punishment," the Eighth Amendment imposes duties on prison officials, "who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Id*. at 832-33 (*citations omitted*).

**I.HEPATITIS C**

8.     The standard of care in the community for Hepatitis C infections—the use of Direct Acting Antiviral Drugs (hereinafter "DAAs")—is well-established. From 2016 to present the standard of care in treatment of chronic Hepatitis C is the use of DAAs and to treat or approve for treatment *everyone regardless* of the severity of fibrosis or cirrhosis.

9.     Defendants' failure to provide adequate treatment and necessary medical care for Hepatitis C, has threatened Bowen with potential death and other serious irreparable harm stemming from his Hepatitis C infection. Bowen has suffered and will continue to suffer grave and irreparable harm unless this Court orders Defendants to provide the safe and effective treatment of DAA's.

## II.     COVID-19 PANDEMIC.

10.    In the past several weeks, the United States and the Commonwealth of Virginia have endured an unprecedented public health emergency in the form of a global pandemic, COVID-19. This emergency has strained the Commonwealth's resources, employment, regional healthcare services, and public institutions. In Virginia, it has caused thousands of infections and hundreds of deaths. By the time the Court reads this, it is certain that more Virginians will have tested positive for the virus and someone new is at risk of death. Nevertheless, even a virus cannot dissolve those fundamental liberties protected in our nation's Constitution and Virginia's inmates should be afforded the same health care and safety precautions as the general public.

11.    Defendants' failure to adequately address the extreme health risk posed by COVID-19 threatens Bowen with a high risk of being infected with COVID-19. Bowen suffers from high-risk health conditions such as compromised, respiratory system (asthma and COPD), immune system, and a heart condition. In 2018 Bowen suffered from the heart attack.

## PARTIES

12.     Plaintiff, Howard Bowen Hankins, Jr. is an inmate (#1197337) currently incarcerated at the Haynesville Correctional Center in Richmond County, Haynesville, Virginia. Prior to December, 2019, Bowen was housed at KMCC, a penal institution owned and operated by the VDOC in Oakwood, Virginia. Bowen has been incarcerated since 2009 and his expected release date is February 7th, 2024. Bowen was diagnosed with chronic Hepatitis C and potential liver damage while in custody of VDOC. The Defendants have consistently denied Bowen access to adequate medical care to treat his chronic Hepatitis C.

13.     Defendant RALPH S. NORTHAM is the Governor of the Commonwealth of Virginia and our Commonwealth's Chief Executive Officer responsible for overseeing, managing, and directing policy for all Virginia agencies, including the Department of Public Safety and Homeland Security, which is the governing agency of the VDOC.

14.      Defendant BRIAN MORAN is the Secretary of Public Safety and Homeland Security, having been reappointed to this position by Governor Northam. Secretary Moran is responsible for overseeing, managing, and directing policy for all agencies within the Department of Public Safety and Homeland Security, including the VDOC and its prisons. Moran was personally informed by Bowen's attorney regarding Bowen's poor health condition and VDOC's policies and practice that violates Bowen's rights under the Constitution and laws of the United States. Moran as a person who is responsible for managing and directing VDOC's police had authority to enforce Bowen's Hepatitis C treatment. Moran was deliberately indifferent to Bowen's prayers to receive necessary treatment for his severe medical condition.

15.     Defendant HAROLD C. CLARKE is the Director of the VDOC and was responsible for all oversight, operation, and administration of the Commonwealth's correctional system, including providing access to adequate medical treatment and the formulation of policies that ensure the provision of that access to adequate medical treatment to Bowen and those similarly situated. He provides final approval of rules applicable to prison inmates. At the time of this filing, the VDOC has publicly confirmed the presence of at least two hundred and sixty (260) positive cases of COVID-19 among VDOC's inmates and staff and at least one death. The VDOC directly oversees all policies and institutional directives for all State Correctional facilities throughout the Commonwealth, including all of those managed by the wardens listed as defendants below. Clarke was personally informed by Bowen's attorney via multiple emails regarding Bowen's severe health condition and need of treatment for Hepatitis C, as well as, a high risk of being infected with the recent COVID-19 that imposes a high probability of severe complications including death due to Bowen's poor health history such as compromised, respiratory system (asthma and COPD), heart failure and weak immune system. Clarke knew about VDOC's Hepatitis C policy and that, in effect, said Hepatitis C policy refused treatment to many inmates including Bowen. At all relevant times Clarke had the authority to order modifications to the Hepatitis C policy in a manner that would have authorized approval for Bowen's Hepatitis C treatment. At all relevant times, Clarke approved and ratified the policies that were administered by Dr. Amonette and that were used to deny treatment to Bowen by Defendants. At all relevant times, Clarke was responsible for knowing all applicable laws regarding the medical treatment of inmates under the VDOC's care, custody, and control.

16.     Defendant TIKKI HICKS is the warden of HCC located in Haynesville, Virginia. Hicks is directly responsible for the care and custody of all prisoners committed to the custody of the VDOC

housed at HCC, including Bowen. She must provide safe, secure, and humane housing and treatment for all VDOC prisoners that reside at HCC, and assure that inmates at HCC, including Bowen, are provided with appropriate medical care. At the time of this filing, HCC has publicly confirmed at least forty-five (45) positive cases of COVID-19. At all relevant times, Hicks knew of Bowen's severe health condition caused by Hepatitis C and his need for effective DAA drug treatment, but she was deliberately indifferent to Bowen's request to receive the necessary treatment for his Hepatitis C.

17.     Defendant CLINT DAVIS is the Warden of the KMCC. Davis is directly responsible for the care and custody of all prisoners committed to the custody of the VDOC housed at KMCC, including Bowen. He must provide safe, secure, and humane housing and treatment for all VDOC prisoners that reside at KMCC, and assure that inmates at KMCC, including Bowen, are provided with appropriate medical care. At all relevant times, Davis knew of Bowen's severe health condition caused by Hepatitis C and his need for effective DAA drug treatment, but she was deliberately indifferent to Bowen's request to receive the necessary treatment for his Hepatitis C.

18.     Defendant MARK AMONETTE is the Chief Physician and Medical Director of the VDOC. Amonette is directly responsible for the medical care and health of prisoners committed to the custody of the VDOC. He is responsible for assuring that inmates, including Bowen, are provided with appropriate medical care. Amonette developed guidelines and operating procedures for Hepatitis C treatment for inmates confined in the VDOC. Amonette is the decision maker in determining which inmates will be referred for Hepatitis C treatment.  At all relevant times, as a director of medical service for VDOC, Amonette had a duty to know that inmates such as Bowen had Hepatitis C and thus needed treatment for Hepatitis C. Amonette's duty extended to collecting data about inmates who have Hepatitis C and ensuring treatment for all inmates who were known

7

to have Hepatitis C, while under the care and custody of the VDOC—irrespective of what stage said Hepatitis C had reached. As VDOC's Chief Physician/Medical Director, and a high-ranking official under the supervision of Defendant Clarke, Amonette reports to Clarke what VDOC inmates are known to be infected by Hepatitis C and if they are receiving treatment for their Hepatitis C infections. Amonette has deliberately failed to treat or approve Bowen's Hepatitis treatment, negate any subordinate's decision or override controlling guidelines, to approve and treat Bowen's Hepatitis C.

19.     Defendant STEVE HERRICK is the Health Service Director for the VDOC. Responsible for providing and managing all the medical health care needs for inmates in VDOC facilities throughout the state of Virginia. His overall responsibility is to assure that efficient and quality care is provided to the incarcerated offenders, including Bowen. Herrick approves all Interim and Final Guidelines and Operating Procedures regarding Hepatitis C treatment for inmates confined in the VDOC. Herrick has deliberately failed to treat or approve Bowen's Hepatitis treatment and failed to implement a policy that ensures such treatment.

20.     Defendants are named in their individual and official capacities. All the actions, omissions and conduct complained of were undertaken by the Defendants under color of state law. Defendant's conduct represents violation to Bowen's rights secured by Constitution and federal laws of the United States.

## FACTUAL ALLEGATIONS

### I. HEPATITIS C

21.     Hepatitis C is a viral infection, primarily spread through contact with infected blood that attacks the liver and causes hepatitis, or liver inflammation, which can significantly impair the

liver's ability to assist the body in digesting essential nutrients, filter toxins from the blood, and prevent disease. Hepatitis C infections are of multiple genotypes and can be of an acute or chronic nature. An acute infection, a short-term illness, occurs within the first six (6) months of exposure to the virus and, for many people, it leads to chronic Hepatitis C infection.

22.     Chronic Hepatitis C infections are serious, long-term illnesses that can last throughout a person's life. Hepatitis C is the leading cause of cirrhosis (irreversible scarring of liver tissue) and liver cancer and is the most common cause of liver transplants. Chronic Hepatitis C infection can also cause serious chronic liver disease, liver fibrosis (scarring of liver tissue), and death.

23.     Cirrhosis of the liver can cause symptoms such as swelling, increased likelihood of bruising, jaundice, itching, nausea, and problems with concentration and memory.

24.     Each day without treatment increases the likelihood of cirrhosis, fibrosis, liver cancer, the need for a liver transplant, other complications from the disease, and death from liver failure. Liver transplants are painful, carry a risk of significant complications, and are nearly impossible for prisoners to obtain. Transplants result in lower recovery rates than treatment with direct-acting antiviral drugs, and are very costly .

25.     At the time Bowen entered the VDOC, he was diagnosed with Hepatitis C and potential cirrhosis of the liver that was confirmed by lab work at KMCC. Bowen's VDOC medical records repeatedly and unequivocally indicated that he is infected with Hepatitis C.

26.      After several communications from Bowen regarding his need for Hepatitis C treatment, in October 2018, Bowen was scheduled for FibroScan by KMCC, a test for determining liver stiffness. The FibroScan result came back abnormal and critical. Bowen's FibroScan result shows 6.0.  If left untreated, the Hepatitis C virus results in continuing injury to the liver.

27.     Bowen has received no treatment for his Hepatitis C infection, despite numerous requests, including offering to pay for the treatment out of his own pocket. VDOC still denied the treatment.

28.     In 2020, Bowen was scheduled for FibroScan by HCC. The FibroScan result came back abnormal and critical. Bowen's FibroScan result increased from 6.0 to 8.3.

29.     Since Bowen was admitted to KMCC and later to HCC, he has continuously requested that VDOC approve treatment for his Hepatitis C infection - despite all Defendants understanding through the review of scientific advancement that there existed a cure for Hepatitis C that requires 12 weeks of treatment - the treatment was denied by VDOC because according to Defendants Bowen did not meet the criteria for Hepatitis C treatment.

30.     The medical treatment is available at VDOC for all inmates who were diagnosed with Hepatitis C, Bowen requested that he be placed on the list to receive the treatment for Hepatitis C. Bowen still has received no treatment for his Hepatitis C infection.

31.     Defendants have refused to use DAA drugs to treat Bowen who is known to be infected with Hepatitis C until he meets certain criteria and failed to implement a policy that ensures the treatment.

32.     At all relevant times, Amonette and Herrick promulgated, ordered, and enforced a policy which prohibited Bowen from being approved and treated for Hepatitis C.

33.     At all relevant times, Moran and Clarke knew Bowen, with Hepatitis C, was not receiving treatment but did not ratify the policy, despite the authority to manage and direct policy to insure the health and safety of VDOC inmates.

34.     At all relevant times, Davis knew of Bowen's severe health condition caused by Hepatitis C and need for effective DAA drug treatment but did not provide Bowen with the appropriate

medical care, despite his responsibility to provide safe, secure, and humane housing and treatment for all VDOC prisoners that reside at KMCC.

35.    At all relevant times, Hicks knew of Bowen's severe health condition caused by Hepatitis C and need for effective DAA drug treatment but did not provide Bowen with the appropriate medical care, despite his responsibility to provide safe, secure, and humane housing and treatment for all VDOC prisoners that reside at HCC.

36.    As a direct and proximate result of the acts and omissions of the Defendants failing to treat Bowen's Hepatitis C virus, Bowen has suffered and will continue to suffer physical injury, pain, loss of life expectancy, loss of enjoyment of life, increased likelihood of additional medical problems, advancement of diseases, emotional distress, psychological pain, suffering, mental anguish, and other damages.

## Exhaustion of Administrative Remedies

37.    On January 14th, 2019, Bowen filed an informal complaint (the first step of VDOC's grievance procedure) at KMCC seeking a treatment for Hepatitis C. Bowen's complaint was denied on January 30th, 2019, because "the guidelines for treatment are set forth by the Health Service Unit in Richmond", and Bowen was "being monitored" at that time (Attached as Exhibit A).

38.    On February 1st, 2019, Bowen appealed the denial of his complaint by filing a regular grievance seeking to obtain the treatment for Hepatitis C. Defendant Davis, the Warden at KMCC, under the supervision of Defendant Clarke, denied this appeal on March 5th, 2019, because in accordance with policies "Operating Procedure" 720.1; 701.1; 740.1. Bowen's "grievance is Unfounded" (Attached as Exhibit B).

39.     On March 14th, 2019, Bowen appealed the denial that was denied March 25th, 2019, citing that Warden Davis's decision affirmed the deprivation of medical care in violation of his civil rights under the U.S. Constitution; it was concluded that Bowen's grievance was "Unfounded" and that "[a]ll administrative remedies have been exhausted regarding this issue" (Attached as Exhibit C).

40.     The most recent complaint Bowen has made was on April 6th, 2020, when Bowen filed an informal complaint at HCC seeking treatment for Hepatitis C.

41.     Bowen continues to be denied treatment for Hepatitis C in an extreme deviation from the standard of care for not meeting the criteria in the VDOC Hepatitis C treatment guidelines.

**The Prevailing Standard of Care Requires Approval for Treatment**

42.     The standard of care in the community for Hepatitis C infections—the use of DAAs — is well-established. From 2016 to present the standard of care in treatment of chronic Hepatitis C is the use of DAAs and to treat or approve for treatment *everyone regardless* of the severity of fibrosis or cirrhosis.

43.     The standard of universal treatment was based on the emergence of medical data. Guidelines published by the American Association for the Study of Liver Disease (AASLD) were changed in 2016, as data emerged regarding the overall liver and non-liver benefits of Hepatitis C therapy, the excellent tolerability of treatment, and the extraordinarily high rates of Hepatitis C, cure and treatment was recommended for everyone with Hepatitis C *regardless* of severity of their liver disease.

44.     Patients who are cured of their Hepatitis C infection experience multiple benefits including a decrease in liver inflammation, improvement in fibrosis, and resolution of cirrhosis in up to fifty percent (50%) of patients; diminished rates of portal hypertension, splenomegaly, and other

clinical manifestations of advanced liver disease; a seventy percent (70%) reduction in the risk of liver cancer; and a ninety percent (90%) reduction in the risk of liver-related mortality and requirement for liver transplantation. In addition, cure of Hepatitis C infection also reduces symptoms and mortality from multiple non-liver associated manifestations of viral infection, including joint pain, rates of lymphoma, fatigue, diabetes, cryoglobulinemic vasculitis, and other non-liver cancers.

**VDOC Guidelines of All persons Infected with Hepatitis C.**

45**.**    The American Association for the Study of Liver Disease ("AASLD") Guidance provides that DAAs cure Hepatitis C infection in 99% of cases, where a cure is defined as "the continued absence of detectable HCV RNA, at least 12 weeks after completion of therapy." AASLD Guidance states the established standard of care as follows:

> "Treatment is recommended for all patients with chronic HCV infection, except those with short life expectancies that cannot be remediated by treating HCV, by transplantation, or by other directed therapy. Patients with short life expectancies owing to liver disease should be managed in consultation with an expert."

46.    Despite AASLD recommendations that all patients with chronic Hepatitis C infection receive treatment, and its guidance that DAA drug therapy is likely to be more effective before the patient suffers significant liver damage, VDOC Interim Guidelines and Operating Procedures exclude from treatment all inmates who fail to meet the "Inclusion Criteria for Consideration of Treatment" and who fail one of the "Exclusion Criteria." VDOC Guidelines and Operating Procedures are contrary to prevailing medical standards in that they do not provide treatment for all persons with chronic Hepatitis C infection, and only treat individuals who have suffered significant liver damage.

47.     Defendants Amonette and Herrick are or were responsible for developing and approving VDOC Interim and Final Guidelines for Chronic Hepatitis C Infection Management and Infectious Diseases Operating Procedures. Amonette ensures that the Hepatitis C guidelines are enforced and followed, and solely determines which inmates will be referred to HCV Treatment. Amonette refers only to inmates with advanced liver disease for treatment with DAA medications which cure 99% of HCV cases, despite his knowledge that AASLD guidance emphasizes that DAA drug therapy is likely to be more effective before the patient suffers significant liver damage.

48.     Three premises are accepted in the current medical standard for treatment of Hepatitis C – a standard that has been in effect since 2016: (1) Having Hepatitis C for *greater than six months* constitutes a chronic illness; (2) The current standard of care is to treat *everyone* with rare exception; and (3) Cost *cannot* be a factor for altering the current standard for medical treatment. Inmates with known, chronic Hepatitis C should be immediately approved for treatment of their Hepatitis C.

49.     From June 2016 VDOC Treatment Guidelines listed inclusion criteria for treatment of Hepatitis C, such as offenders had to suffer from advanced liver disease before being approved for treatment; and having "at least 9 months remaining on their sentence at the time of treatment initiation." VDOC cited no medical reason to justify this policy, in light of a cure that takes literally 90 days or less to cure Hepatitis C, 120 days at max.

50.     The Interim Guideline fails to follow the AASLD guidance that all patients with chronic HCV infection, except those with short life expectancies, should be treated with DAAs, and that DAA drug therapy is likely to be more effective before the patient suffers significant liver damage.

14

51.     VDOC Interim Guidelines and Operating Procedures for Hepatitis C do not comply with prevailing medical standards. Even though Bowen has been diagnosed with chronic Hepatitis C infection, Defendants have refused to refer Bowen for treatment and testing, and have drafted and approved HCV treatment guidelines which have consistently harmed Bowen in that they prevent him from getting treatment for his Hepatitis C. Defendants have also denied Bowen treatment based on the non-medical factor. Defendants' actions are contrary to prevailing medical authority.

## II.    COVID-19

### Threat of COVID-19

52.      COVID-19 (also referred to herein as "Coronavirus") is an infectious disease caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). As of April 20th, 2020, a new strain of coronavirus which causes COVID-19, is known to have infected over 2,430,309 people, leading to at least 166,264 deaths worldwide and 41,000 deaths in the United States. There are over 8,990 confirmed cases in Virginia and there have been 300 deaths as a result of COVID-19.

(https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html).

53.     Common symptoms of COVID-19 include fever, cough, and shortness of breath as well as muscle pain, nausea, vomiting, diarrhea, sore throat, and abdominal pain. The majority of COVID-19 cases result in mild symptoms, while some progress to viral pneumonia and multi-organ failure.

54.     The World Health Organization (WHO) and Center for Disease Control (CDC) claim that COVID-19 is most commonly spread during close human contact being less than 6 feet (2 meters) via small droplets produced when people cough, sneeze, or talk. People may also catch COVID-19 by touching contaminated surfaces and then their face. The virus can survive on surfaces for up

to seventy-two (72) hours, specifically for one day on cardboard, for up to three days on plastic and stainless steel.

55.     It is most contagious during the first three days after symptoms onset, although spread may be possible before symptoms appear and in later stages of the disease.

56.     Time from exposure to onset of symptoms is generally between two (2) and fourteen (14) days, with an average of five (5) days, and typically eight (8) days to needing mechanical ventilation for those suffering from severe symptoms.

57.     Those with severe or critical diseases may take three to six weeks to recover and among those who have died, the time from symptom onset to death has ranged from two (2) to eight (8) weeks.

58.     The standard method of diagnosis is via reverse transcription polymerase chain reaction (rRT-PCR) from a nasopharyngeal swab. The infection can also be diagnosed from a combination of symptoms, risk factors and a chest CT scan showing features of pneumonia.

59.     Currently, there is no vaccine or specific antiviral treatment for COVID-19. Management involves treatment of symptoms, supportive care, isolation, and experimental measures.

60.     Emergency symptoms include difficulty breathing, persistent chest pain or pressure, confusion, difficulty waking, and bluish face or lips; immediate medical attention is advised if these symptoms are present.

61.     In those most severely affected, COVID-19 may rapidly progress to acute respiratory distress syndrome (ARDS) causing respiratory failure, septic shock, or multi-organ failure.

62.    Due to the respiratory complications, those like Bowen with compromised lung capacity as a result of certain conditions including asthma, emphysema, chronic obstructive pulmonary disease ("COPD"), lung cancer, or the removal of one lung are at higher risk of death should complications arise.

63.    Complications associated with COVID-19 include sepsis, abnormal clotting, and damage to the heart, kidneys, and liver, especially of those who have pre-existing conditions including hypertension, diabetes, cardiovascular disease, and heart disease, those like Bowen with pre-existing complications associated with a heart failure in 2017 are at higher risk of death should complications arise.

**Basic Practices And Accepted Norms In Response To COVID-19**

64.    A vaccine is not expected until 2021, therefore a key part of managing COVID-19 is trying to decrease the epidemic peak, known as "flattening the curve," by slowing the infection rate to decrease the risk of health services being overwhelmed, allowing for better treatment of current cases, and delaying additional cases until effective treatments or a vaccine become available.

65.    Preventive measures to reduce the chances of infection include avoiding public spaces and gathering, avoiding crowded places, wearing face masks and gloves, maintaining a "social distancing" of minimum six (6) feet from others, frequent hands washing with soap and warm water for at least twenty-seconds, practicing good respiratory hygiene, and avoiding touching the eyes, nose, or mouth with unwashed hands.

66.    Medical professionals, including Governor Northam, recommend the use of masks for everyone, especially those who suspect they have the virus and their caregivers. A particular model

of masks ("N95 masks") is considered to serve particularly well to protect against the inhaling and exhaling of contaminated air.

67.     "Social distancing" strategies aim to reduce contact of infected persons with large groups by closing schools and workplaces, restricting travel, and cancelling mass gatherings. Social distancing also includes that people stay at least six (6) feet apart.

### Response To COVID-19 & Spread Throughout The Commonwealth

68.     On March 11th, 2020, the World Health Organization officially classified COVID-19 as a pandemic.

69.     On March 13th, 2020, the President of the United States declared a national emergency in response to the public threat to health posed by COVID-19.

70.     On March 12th, 2020, Virginia's Governor Ralph Northam declared a State of Emergency in response to the threat to health posed by COVID-19.

71.     On March 17th, 2020, the Honorable Chief Justice Lemons of the Virginia Supreme Court declared a Judicial Emergency in light of COVID-19 and ordered all General District and Circuit Court proceedings to be halted, subject to a narrow list of exceptions requiring immediate judicial attention.

72.     On March 19th, 2020, Governor Northam and Brian Moran, Virginia's Secretary of Public Safety, requested law enforcement, prosecutors, and judges to consider alternatives to incarceration as a result of this pandemic.

73.     On March 20th, 2020, Governor Northam activated the National Guard to aid Virginians during the State of Emergency posed by COVID-19.

74.     On March 30th, 2020, Governor Northam enacted Executive Order No. 55 ("EO55") which ordered, in part: "All individuals in Virginia shall remain at their place of residence, except as provided below by this Order and Executive Order 53. To the extent individuals use shared or outdoor spaces, whether on land or on water, they must at all times maintain social distancing of at least six feet from any other person, with the exception of family or household members or caretakers."

75.     EO55 closed all public universities, beaches, and ordered "[a]ll public and private in-person gatherings of more than ten individuals are prohibited," including "parties, celebrations, religious, or other social events, whether they occur indoor or outdoor."

76.     At a public press conference on April 6th, 2020, Governor Northam recognized the value of wearing masks as a means of reducing the risk of COVID-19 contamination. At the press conference, he demonstrated the proper way to wear a mask, covering both the mouth and nose, using a mask made by the inmates in the VDOC.

77.     At the same press conference, Governor Northam publicly recognized and reiterated the importance of personal protective equipment (i.e. masks, gloves, sanitizers, etc.) as well as the value and importance of COVID-19 testing and medical equipment such as ventilators.

78.     Governor Northam and the Commonwealth are working with the Army Corps of Engineers to identify alternative healthcare facilities due to the expected impact and complications of overwhelming population at traditional hospitals and healthcare facilities.

79.     Neither Governor Northam nor Secretary Moran have ordered Virginia's state government to identify alternative facilities or alternative methods of incarceration for inmates in the VDOC prison system.

80.     On April 3rd, 2020, President Trump declared Virginia to be a "major disaster area" in light of the impact and spread of COVID-19.

81.     On April 3rd, 2020, United States Attorney General William Barr issued a State of Emergency within the U.S. Bureau of Prisons due to the threat posed by COVID-19 in the prison population and ordered the expedited release of inmates to home confinement via the use of home electronic GPS ankle monitoring.

82.     As of April 20th, 2020, there are over 8,990 known cases of COVID-19 in Virginia, with over 300 deaths coming as a result.

83.     As of April 20th, 2020, COVID-19 has been positively identified of at least one hundred thirty nine (139) positive cases of COVID-19 among VDOC's inmates and staff of which at least forty five (45) positive cases of COVID-19 at HCC where Bowen is housed (https://vadoc.virginia.gov/news-press-releases/2020/covid-19-updates).

84.     The conditions of confinement throughout the correctional facilities in VDOC create an ideal environment for the transmission of COVID-19.

**Conditions of Confinement & Institutional Practices That Pose Heightened Risks of Infection in Haynesville Correctional Center**

85.    Inmates and staff cycle in and out of Virginia's correctional facilities from multiple regions of the Commonwealth, as well as, multiple service providers and contractors leave and return daily.

86.    Incarcerated people oftentimes have poorer health than the general population and, even in the best of times, medical care is limited.

87.    Most of Virginia's Correctional Facilities including HCC is located in rural or remote regions of the Commonwealth and is relatively far from Virginia's largest hospitals and other medical resources.

88.    According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe," "infection control is challenging in these settings."

89.    Prisons are amplifiers of infectious diseases such as COVID-19 because the practices that keep diseases from spreading, such as social distancing, are inherently more onerous to achieve in VDOC State Correctional facilities because these prisons engage in high-density, centrally housed confinement and therefore have infrastructural limitations on space, resource allocation, and staff-to-inmate ratio.

90.    In Virginia's local jail system, multiple localities, Commonwealth's Attorneys, jail superintendents, and circuit courts have taken measures to limit inmate contact with outside individuals, including limits on contact visits between clients and attorneys. Multiple jails throughout the Commonwealth of Virginia have ordered the early release of select prisoners as well as the release and continued incarceration of inmates via home electronic GPS monitoring.

91.     Bowen is currently housed in compact quarters with no less than ten (10) but as many as ninety (90) other adult inmates in their immediate housing facility. He sleeps two to three feet away from other inmates and the amount of space they have at his current facility makes it impossible for inmates and staff to be six (6) feet apart from one another.  HCC is normally overcrowded and has remained the same during the COVID-19 pandemic. Many individuals come and go from the prison on a routine basis and have been in contact with other inmates, VDOC Staff, and contractors who have contracted the virus.

92.     VDOC facilities use cycled air, community washed clothing, community accessed and prepared food, equipment, and community accessed supplies in a fashion that  enhances the likelihood of contamination and infection for Bowen.

93.     VDOC facilities use community accessed phones, computers, books, libraries, tables, chairs, games, cards, televisions, remotes, doors, cells, light fixtures, and other similar items used in daily life.

94.     The Defendants have failed to enact or enforce policies for staff, contractors, and inmates that present a material form of protection via the required use of masks, gloves, sanitizer, or other sanitation protection for the staff, inmates, their equipment, phones, computers, clothing, food, or other items in daily use, as well as, to materially limit social gatherings or adhere to social distancing guidelines.

95.     The Defendants know or have the reason to know that contagious individuals may not show symptoms of COVID-19 and may not display a high body temperature yet, even when they remain highly contagious, they continue to adhere to policies that require the interaction of large crowds of inmates and staff in tight quarters.

96.     The Defendants have taken no action to identify and remove inmates, like Bowen, who are at particularly high risk of suffering from complications from COVID-19. The Defendants have not amended or enforced any procedures, policies, or guidelines for the housing of inmates that suffer from chronic health-related issues, those who are elderly, or those who have compromised respiratory systems.

97.     Specifically, Defendants NORTHAM, MORAN, and CLARKE have failed to issue or enforce material guidelines or policies requiring State Correctional facilities to identify elderly inmates or inmates with known risks to their respiratory system, cardiovascular system, or acute threats to their immune system even though such inmates are known to be at a high risk of suffering material, even fatal, complications from COVID-19.

98.     Additionally, Defendants NORTHAM, MORAN, CLARKE, and HICKS have failed to issue or enforce any material, requisite guideline or policy for the removal of those individuals most at risk from the largest of housing units with general quarantine policies and placing these at-risk individuals in housing units with more uniquely-tailored sanitation or quarantine policies or in units smaller gatherings of individuals.

99.     The Defendants have not procured or attempted to procure the amount of hygienic or sanitary supplies reasonably necessary for inmates to protect themselves against contracting COVID-19.

100.    The Defendants have not enacted or attempted to enact any form of alternative method of incarceration, such as home electronic GPS ankle monitoring ("home electronic monitoring" or "HEI"), as a means of reducing the density of their prison population in response to the risk posed by compact social gatherings of inmates.

101.    The Defendants are responsible for providing reasonable care and resources for Bowen as

an inmate, is a ward of the Commonwealth of Virginia and remains protected by the Constitution

of the United States, specifically the Eighth Amendment's guarantee that he is to be protected from

cruel and unusual punishment as applied to the States via the Fourteenth Amendment.

102.    The Defendants have a duty to Bowen to provide, protect, and ensure contemporary

standards of decency and, at a minimum, the civilized measure of life's necessities.

## COUNT I.
## DEPRIVATION OF EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT BY RECEIVING ACCESS TO ADEQUATE MEDICAL CARE PURSUANT TO 42 U.S.C § 1983

103.    Bowen incorporates by reference herein the preceding paragraphs of this Complaint.

104.    Defendants have intentionally and deliberately ignored Bowen's need for medical attention

and care for Hepatitis C and were deliberately indifferent to Bowen's serious medical needs. The

FibroScan test in 2018 confirmed Bowen 's critical stage, then the 2020 test confirmed that his

health condition is getting worse.

105.    Defendants are aware of Bowen's condition and have access to medications which would

essentially cure Bowen's Hepatitis C virus. Nevertheless, Defendants have failed to provide the

treatment for Bowen's Hepatitis C virus.

106.    The failure of all defendants to provide treatment for Bowen has consistently harmed him,

and he continues to have chronic Hepatitis C infection and potential cirrhosis of the liver.

107.    The failure to provide appropriate medical care has caused Bowen to have an increased

probability of liver inflammation, liver fibrosis, cirrhosis, and other forms of advanced liver

disease, including cancer, and increased rates of morbidity and mortality.

108.    Defendants' failure to provide appropriate medical care is deliberate and intentional and not objectively reasonable under the circumstances.

109.    Defendant's failure, or refusal, to provide adequate medical care for Bowen's serious medical need in an appropriate and timely manner constitutes deliberate indifference to serious medical needs.

110.    Defendants' deliberate indifference to Bowen's serious medical needs caused Bowen physical pain and suffering, mental anguish, emotional distress, loss of enjoyment of life, deterioration of his health and an undue risk of premature death, and other damages.

111.     By failing to provide Bowen with constitutionally adequate medical care, the Defendants have and continue to knowingly disregarded an excessive risk to his health and safety and knowingly subjected him to pain, suffering, and physical and mental injury, thereby violating his rights under the United States Constitution.

112.    Defendants' delay, denial, and deployment of irrelevant excuses for failing to treat Bowen constitute reckless indifference to his serious medical condition.

113.    Based on the incorporated paragraphs Defendants' acts and omissions in failing to provide adequate medical care constitute deliberate indifference to the serious medical needs of Bowen, specifically his untreated chronic Hepatitis C that leads to potential liver failure, thereby establishing a violation of the Eighth Amendment of the United States Constitution; consequently, Bowen is entitled for relief.


## COUNT II.
### DEPRIVATION OF EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT BY RECEIVING DECENT HUMAN CONDITIONS OF CONFINEMENT AND THE GUARANTEE OF THE SAFETY PROTECTION AGAINST THE CURRENT COVID-19 PANDEMIC PURSUANT TO 42 U.S.C § 1983

**I. Population Density & Spatial Limitations**

114.    Bowen incorporates by reference herein the preceding paragraphs of this Complaint.

115.    The Defendants know or have reason to know the housing conditions, including size of confinement and population density, along with the health risks of particular inmates, including Bowen.

116.    The Defendants know that COVID-19 is commonly spread via transmission as a result of close human contact.

117.    The Defendants know or have reason to know that VDOC staff, contractors, and inmates have come in contact with or at a serious and substantial risk of unwittingly coming in contact with other individuals  on a constant basis who have been possibly infected with COVID-19 or objects that are contaminated with the virus.

118.    The Defendants know that VDOC inmates, including Bowen, do routinely live, eat, work, and generally congregate in high-density settings that involve close contact between and among many persons and many objects.

119.    The Defendants know or have reason to know that increasing the spatial distance between individuals, specifically by six feet or more, and reducing the amount of individuals in a closed setting, specifically to a number of ten people or less, is a means of reducing the risk of spreading COVID-19.

120.    These aforementioned practices of distancing and limiting population density have been publicly encouraged via officials at all levels of Government, commercial enterprise, and

American culture, including Virginia, where it has been enacted into law in most settings via Executive Orders promulgated by Governor Northam.

121.    The Defendants know that the VDOC inmates, including Bowen, along with staff and contractors, are not in a setting, are not subject to an environment, and are not provided or protected by prison policies, resources, or infrastructure that offers or requires the spatial distance or reduction in close-quarter population that is reasonably necessary to protect against the substantial risk of spreading COVID-19.

122.    The Defendants know that this substantial risk of spreading COVID-19 to and among inmates, including Bowen, who has asthma and COPD, heart failure, pose a substantial, serious, and significant risk to Bowen's physical health.

123.    The Defendants know or have reason to know of other reasonable efforts, practices, policies, resources, and infrastructure that can be established to provide the spatial distance and reduction in population density necessary to reduce this ongoing risk, nevertheless these Defendants refuse to do so.

124.    The Defendants know or have reason to know that VDOC's failure to implement alternative sentencing, alternative housing measures, and alternative methods of incarceration enhances the risks of spatial limitations and population density in a fashion that poses a serious, substantial, and significant risk to those inmates who could reasonably be subject to such alternatives as well as those who remain confined according to the status quo.

125.    The Defendants have a duty to protect Bowen from these conditions and these risks, they have not done so in a reasonable fashion, and are therefore depriving him in an extreme manner

via conditions of confinement that constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendment.

## II. Lack of Supplies, Equipment, & Sanitation Policies for Inmates and Staff

126.    Bowen incorporates by reference herein the preceding paragraphs of this Complaint.

127.    The Defendants know or have reason to know that COVID-19 is commonly spread via transmission from its location on an object that was in the presence of an infected individual can remain contagious once transmitted to an object can infect another individual once that object has been touched with a hand or clothing and such individual subsequently touches their face with that hand or clothing.

128.    The Defendants know or have reason to know that inmates, including Bowen, along with staff and contractors come in contact with objects on a routine and constant basis and such contact during a pandemic without additional measures poses a serious, significant, and substantial risk of spreading COVID-19.

129.    The Defendants know or have reason to know that there are supplies, equipment, tools, and chemicals  such as reusable and disposable masks, gloves, hand sanitizer, liquid and bar soap, disinfecting wipes, aerosol spray, and sanitizing of commonly touched items can reduce or prevent the transmission of COVID-19 from an infected individual to others.

130.    The practice of using, requiring, or providing these sorts of supplies, equipment, tools, and chemicals is a common societal practice during the COVID-19 pandemic that has been recommended by public officials in all levels of Government, including Governor Northam

publicly referenced and displayed the use of these tools, specifically a wearable mask, in his address to the Commonwealth on April 6th, 2020.

131.    The Defendants know or have reason to know requiring staff and contractors to have and use these and similar items as well as providing these items to inmates along with other risk-reducing measures during the ongoing COVID-19 pandemic is a contemporary standard of decency recognized throughout the United States and the Commonwealth of Virginia

132.    The VDOC facilities lack any uniform or explicit policies governing prison Staff's or contractor's requisite provision and use of these items and provide these items to inmates that are known to protect against the transmission of COVID-19 to objects or other persons.

133.     Failure to require prison staff and contractors to adhere to such policies regarding these and similar items, presents a significant, substantial, and serious risk of continuous transmission of COVID-19 from staff and contractors who leave the prison on a daily basis to interact with the public and then return to the prison to interact with inmates and the objects they routinely use.

134.    The Defendants know or have reason to know that the VDOC inmates, including Bowen, along with staff and contractors, are not provided or protected by prison policies, resources, or infrastructure that offers or requires these or other similar items that are reasonably necessary to protect against the substantial risk of spreading COVID-19.

135.    The Defendants know that this substantial risk of spreading COVID-19 to and among inmates, including Bowen, poses a substantial, serious, and significant risk to Bowen's physical health.

136.    Unlike private citizens seeking medical attention in the public at-large, these VDOC  inmates are wards of the Commonwealth of Virginia, therefore it is the Commonwealth's duty to ensure the protection of their health. Defendants NORTHAM and MORAN have specifically failed to account for this risk by placing the VDOC and its prisons in a position where the VDOC must compete with other entities to receive State-procured personal protective equipment.

137.    The Defendants know or have reason to know of reasonable efforts, practices, policies, resources, and infrastructure that can be established to provide and require these items for inmates, staff and contractors during this ongoing risk, nevertheless these Defendants refuse to do so.

138.    The Defendants have a duty to protect Bowen from these conditions and these risks, they have not done so in a reasonable fashion, and are therefore depriving them in an extreme manner via conditions of confinement that constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Mr. Howard Bowen Hankins, Jr., prays for a trial by jury and judgment against Defendants as follows:

(A) That Bowen receives his reasonable attorneys' fees and litigation costs pursuant to 42 U.S.C. § 1988 and other applicable law;

(B) That Bowen receive compensatory damages;

(C) That Bowen receive Punitive Damages;

(D) That Bowen receive Special Damages in an amount of at least $50,000 to include the cost of medical care to treat his Hepatitis C and complications from his Hepatitis C that went untreated for years;

(E) Issue a judgment declaring that defendants' policies, practices, acts and/or omissions as described herein are unlawful and violate Bowen's rights under Eighth Amendment of the Constitution and laws of the United States;

(F) Declare the Defendants' failure to enact policies to reduce the population density in VDOC prisons during the COVID-19 pandemic results in conditions of confinement that present such an imminent risk to Bowen's health that it violates Bowen's rights  under Eighth Amendment of the Constitution and laws of the United States;

(G) Declare the Defendants' failure to enact policies requiring and providing personal protective equipment and sanitary supplies and practices during the COVID-19 pandemic for Bowen that it results in conditions of confinement that present such an imminent risk to health that it violates Bowen's rights  under Eighth Amendment of the Constitution and laws of the United States;

(H) Declare the Defendants' failure to enact policies that require VDOC staff and contractors to use personal protective equipment, and engage in additional measures to reduce the transfer and spreading of the virus that it produces conditions of confinement that present such an imminent risk to health that it violates Bowen's rights  under Eighth Amendment of the Constitution and laws of the United States;

(I) Enjoin the Defendants, their agents, employees, representatives from subjecting Bowen to the unlawful and unconstitutional treatment described herein, and grant such injunctive order as necessary to:

(i) Require Defendants to provide Bowen with necessary and appropriate treatment for Hepatitis C;

(ii) Mandate the Defendants to implement immediate, material policies to alleviate the population density in the State Correctional Facilities as a means of enhancing the practice known as social distancing;

(iii) Order the Defendants to implement immediate, material policies to separate inmates into housing such that the number of inmates in an individual housing unit materially decreases and the space between sleeping and recreational areas increases;

(iv) Ordering the Defendants to implement alternative methods of incarceration, specifically the use of home electronic GPS ankle monitoring, as a means of alleviating the population density in the VDOC facilities;

(v) Ordering the Defendants to identify and release at-risk portions of the inmate population to alternative confinement based on their age and health records as a means of alleviating the population density in the VDOC facilities;

(vi) Ordering the Defendants to cease VDOC activities in which more than ten (10) inmates are required to be close quarters;

(vii) Ordering the Defendants to enact uniform policies requiring the immediate procurement, provision, and use of personal protective equipment and other health measures by VDOC staff, particularly those who come into regular personal contact with inmates, their goods, supplies, commissary, and food;

(viii) Ordering the Defendants to enact uniform policies requiring the immediate procurement and provision of personal protective equipment to inmates;

(ix) Enjoining the Defendants from engaging in any other conduct this Court finds violative of Bowen' rights as alleged;

(J) Grant all such other and further relief as this Court may deem appropriate in the interests of justice.

> Respectfully submitted
>
> By: __/s/ *William Peyton Akers*____
> William Peyton Akers, Esq. (VSB No. 89933)
> AKERS & CLEATOR LAW GROUP, PLLC
> 291, Mclaws Circle, Suite 1,
> Williamsburg, VA 23185
> Phone: (757) 707-8838
> Fax: (757) 707-8828
> Email: Peyton@aclawva.com
> *Counsel for the Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of April, 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system. I will then send the document and a notification of such filing (NEF) with a summons to the following parties via personal service or an acceptable alternative via private carrier with proof of service to be provided to the Court.

Governor Ralph S. Northam Executive
Mansion Capitol Square Richmond, VA
23218

Secretary Brian J.Moran Secretary of
Public Safety 1111 E Broad St # 5035,
Richmond, VA 23219

Director Harold Clarke
Virginia Department of Corrections 6900
Atmore Dr.
Richmond, VA 23225

Warden Tikki Hicks
Haynesville Correctional Center 421
Barnfield Rd.
Haynesville, VA 22472

Warden Clint Davis
Keen Mountain Correctional Center
State Route 629
Oakwood, Va 24631

Mark Amonette, M.D.
Chief Physician and Medical Director
Virginia Department of Corrections 6900
Atmore Dr.
Richmond, VA 23225

Steve Herrick
Director, Office of Health Services
Virginia Department of Corrections 6900
Atmore Dr.
Richmond, VA 23225

By: __/s/ *William Peyton Akers*___
William Peyton Akers, Esq. (VSB No. 89933)
AKERS & CLEATOR LAW GROUP, PLLC

291, Mclaws Circle, Suite 1,
Williamsburg, VA 23185
Phone: (757) 707-8838
Fax: (757) 707-8828
Email: Peyton@aclawva.com
*Counsel for the Plaintiff*